Filed 10/15/13  In re Drake B. CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re DRAKE B., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, | F066867 |
| Plaintiff and Respondent, | (Super. Ct. No. JD126612-00) |
| v. | **OPINION** |
| SHANE B., | |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from orders of the Superior Court of Kern County.  William D. Palmer, Judge.

Linda J. Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

Theresa A. Goldner, County Counsel, and Thomas G. Morgan, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P.J., Kane, J. and Poochigian, J.

Shane B. appeals from the juvenile court's orders denying his petition to modify a prior order (Welf. & Inst. Code, § 388)[1] and terminating his parental rights as to his six-year-old son, Drake. (§ 366.26.) We affirm.

## PROCEDURAL AND FACTUAL SUMMARY

In June 2011, the Kern County Department of Human Services (department) took then three-year-old Drake into protective custody after his mother Sara struck a parking lot pillar at approximately 50 miles per hour while driving under the influence of prescription medication and with Drake as a passenger in the car. Sara was arrested for driving under the influence (DUI) and child endangerment. She was also arrested in 2009 and 2010 for DUI and was involved in six vehicular accidents between November 2008 and June 2011. She admitted using at least 40 prescribed Norco and 20 prescribed Soma on a daily basis.

Sara told the investigating social worker that she and Drake's father, Shane, lived together for approximately five years but separated sometime around April 2010, after which she and Shane shared legal custody of Drake. She also stated that she and Shane had another son, Ryder, who died in May 2010, while in Shane's care. She explained that Shane was sleeping with Ryder in the bed and rolled over onto him. Shane awoke to find Ryder dead. The coroner listed the cause of then six-month-old Ryder's death as "sudden unexpected death associated with bedsharing and aspirated gastric contents." At the time of Ryder's death, Shane tested positive for benzodiazepines, cocaine and marijuana.

Shane told the social worker that he was aware of Sara's use of prescription medication and her DUI. He said that he normally smoked marijuana nightly before going to bed but had not smoked it in approximately two months. He declined to identify

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

any other drugs he used and referred the social worker to the police report taken at the time of Ryder's death.

The department filed a dependency petition under section 300, subdivision (b) (subdivision (b)), alleging that Sara and Shane's drug use and inadequate protection and supervision placed Drake at a substantial risk of harm. The department subsequently amended the petition to include a subdivision (b) allegation that Shane was aware of Sara's history of using prescription pain medication and driving under the influence, provided Sara prescription narcotics (Norco and Soma) approximately two to three times a week since approximately 2004, and allowed Drake to remain in her custody unsupervised.

In August 2011, at an uncontested jurisdictional hearing, the juvenile court sustained the amended dependency petition and found the allegations true. The following month, at an uncontested dispositional hearing, the juvenile court exercised its dependency jurisdiction, ordered Drake removed from Shane and Sara's custody, and ordered each a plan of reunification that required them to participate in counseling for child neglect, grief, parenting and substance abuse, and submit to random drug testing. The juvenile court also ordered weekly supervised visitation and set the six-month review hearing for March 2012. Drake was placed with Windi K., Sara's first cousin.

Over the ensuing six months, neither Shane nor Sara complied with their services plan. Shane attended an initial appointment at Haven Counseling Center for parenting and neglect classes but did not return. He also refused to sign up for substance abuse counseling and submit to drug testing despite repeated requests and urging by the social worker. He told his social worker that he was unable to participate in services because he worked out of town. He declined her offer to arrange for drug testing in the county where he was working and refused on-the-spot drug testing. During a visit in February 2012, Shane stated that he expected to regain custody of Drake at the hearing in March. The social worker advised him that the department would probably recommend termination of

3

services given his lack of progress and refusal to drug test. According to the social worker, Shane appeared shocked and stated that the juvenile court should return Drake to his custody because he had had a difficult time since Ryder's death. He stated, "'Since I haven't pissed dirty for you guys, you don't have anything on me and there isn't any reason not to give me my son back.'"

In its report for the six-month review hearing, the department informed the juvenile court that Shane regularly visited Drake and was engaging of him and patient with him. Sara, on the other hand, had not visited Drake since December 2011, or kept in contact with the social worker.

In March 2012, the juvenile court conducted the six-month review hearing and continued reunification services for Shane and Sara. Sara was not present at the hearing. However, Shane was present and the juvenile court advised him that the only reason it continued services was because Drake was three years old at the time he was initially removed and the statute required it. The juvenile court also warned him that if he did not progress by the 12-month review hearing in June 2012, that it would go "a different direction."

In its report for the 12-month review hearing, the department informed the juvenile court that Sara had not visited Drake or contacted the department since December 2011, and her whereabouts were unknown. As to Shane, it reported that his visits with Drake continued to go well but that Shane had not enrolled in any of his services or drug tested. Meanwhile, Drake had adjusted well to living with Windi and her husband and they wanted to adopt him. In light of the circumstances, the department recommended that the juvenile court terminate reunification services and set a section 366.26 hearing to implement a permanent plan.

The 12-month review hearing, originally calendared for June 2012, was continued and conducted in August 2012. In the interim, Shane told his social worker that he enrolled in Haven Counseling Center in April 2012 and attended 12 weeks of the 52-

4

week parenting and neglect program. In addition, he submitted to a drug test in mid-June 2012, and stated that the test results would be positive for marijuana.

In August 2012, Shane appeared at the 12-month review hearing. His attorney informed the juvenile court that Shane attended over 20 parenting classes, attended substance abuse classes and was drug testing.

After hearing argument, the juvenile court terminated reunification services and set a section 366.26 hearing. Shane challenged the juvenile court's setting hearing by writ petition (F065619), which we denied.

In February 2013, after a month in jail, Shane filed a section 388 petition asking the juvenile court to return Drake to his custody. He attached a certificate showing he completed substance abuse treatment from WestCare in January 2012, and monthly drug test results for August through December 2012, showing negative results in August and positive results for opiates in September through December 2012. The results were annotated to reflect that he was taking various prescription medications, including Soma, Norco and hydrocodone.

Social worker Roxanne Vasquez met with Shane to discuss his section 388 petition. He said he was not requesting family reunification services as he had already completed them. Instead, he wanted Drake returned to him under family maintenance. He said he did not want anyone else raising his child and stated that Drake was never taken from him; he was removed because of Sara's actions.

Vasquez contacted the staff at Haven Counseling Center and was told the center would be closed at the end of February 2013, and Shane would be referred to another agency to complete his program. According to the February 2013, progress report, Shane completed 35 weeks of counseling, recognized his problem, participated openly and was cooperative. Vasquez also verified that Shane completed outpatient treatment at WestCare in January 2013, rather than in 2012, as reflected on his certificate.

5

The department reported to the juvenile court that Shane consistently visited Drake and they shared a strong bond. In addition, Drake stated he did not want to be adopted and wanted to return to Shane's custody. The department, however, opined that Drake did not fully understand the meaning of adoption. The department also opined that Drake was adoptable and his relationship with Shane was not significant enough to cause Drake severe emotional trauma if Shane's parental rights were terminated. The department recommended the juvenile court deny Shane's section 388 petition and terminate his parental rights.

In March 2013, the juvenile court conducted a combined and contested hearing under sections 388 and 366.26. Sara did not personally appear. Shane testified he completed 18 or more hours of parenting and neglect classes while incarcerated and he submitted his certificate of completion to the court. He worked as a plumber and lived with his mother, where he planned to stay until he acquired his own home.

Shane further testified that Drake lived with him from birth to his detention and they were very close. Drake knew him as his father and asked about coming home "all the time." Shane believed it would be in Drake's best interest to return to his custody because of the closeness of their relationship and believed terminating his parental rights would harm Drake because Shane raised him as his son. He denied ever providing Sara hydrocodone or any other drugs.

Social worker Vasquez testified the only certificate of completion she received from Shane was for substance abuse counseling from WestCare. She said Shane had not contacted her since his release from jail.

Ms. Vasquez further testified Shane's visits with Drake were of "good quality" and the visits usually ended with hugs. She believed there was still a bond between Shane and Drake.

Windi, Drake's caretaker, testified she supervised visits between Shane and Drake since June of 2012. Drake was excited to see Shane and ran to him when he saw him.

6

He did not ask to talk to Shane between visits but was excited to talk to Shane when Shane called him. She said she saw Shane, Sara and Drake during the holidays before Drake was detained and described Shane and Drake as being "close." She could not say if their relationship had diminished but said there was "very much affection" when they saw each other. She did not know if Drake would be emotionally harmed if he was not able to see Shane anymore but knew he would miss Shane.

Following argument, the juvenile court denied Shane's section 388 petition. In doing so, the court expressed its concern that Shane denied his responsibility for providing Sara drugs even though the juvenile court previously found otherwise. In addition, the court found no evidence that returning Drake to Shane's custody was in Drake's best interest.

The juvenile court proceeded to hear argument on the department's recommendation to terminate Shane's parental rights. Shane's attorney asked the juvenile court to find that the parent-child benefit exception to adoption applied. He argued that Shane regularly visited Drake and there was a strong bond between them. He further argued it would be detrimental to terminate Shane's parental rights. Minor's counsel joined in his argument.

At the conclusion of the hearing, the juvenile court found Drake adoptable. The court also found that Shane maintained regular visitation and contact with Drake but did not find that continuing their relationship would benefit Drake. The court terminated Shane and Sara's parental rights. This appeal ensued.

## DISCUSSION

### I. Denial of Shane's section 388 petition

Shane contends the juvenile court abused its discretion in denying his section 388 petition because he substantially complied with his reunification services and because Drake was closely bonded to him and wanted to live with him.

7

Any party may petition the juvenile court to modify or set aside a prior dependency order pursuant to section 388 on grounds of changed circumstance or new evidence. (§ 388, subd. (a).) The party bringing the section 388 petition must also show the proposed change is in the best interests of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Section 388 provides a means for the court to address a legitimate change of circumstances even at the permanency planning stage while protecting a child's need for prompt resolution of his or her custody status. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Whether the juvenile court *should* modify a previously made order rests within its discretion and its determination will not be disturbed absent a clear abuse of discretion. (*In re Stephanie M., supra,* at p. 318.)

The issue in this case was not whether Shane met his burden of proving changed circumstances but whether he proved returning Drake to his custody would serve Drake's best interest. Three principle factors bear on the juvenile court's evaluation of best interests in the context of a section 388 petition: (1) the seriousness of the problem that necessitated dependency and the reason the problem continued; (2) the strength of relative bonds between the dependent child to the parent and caretakers; and (3) the degree to which the problem may be easily removed and the degree to which it actually has been. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.)

Here, the juvenile court stated it had no evidence returning Drake to Shane's custody would be in Drake's best interest. What the court did have was great concern about Shane's refusal to take responsibility for contributing to Sara's drug abuse and ultimately to Drake's removal. The court was very emphatic on that point. It stated:

> "[Shane] has, to this date and to the time of his testimony this morning, continued to maintain that he had no responsibility for [the initial incident], even though the Court has found otherwise and even though the facts suggest otherwise. That to me is very, very, not only telling, but very concerning."

Indeed, 21 months had passed from the time of Drake's removal and Shane still did not acknowledge his part in it despite a year of counseling.

8

Shane contends the juvenile court had compelling evidence that Drake's return would serve his best interests; namely, Drake's statements he did not want to be adopted and wanted to live with Shane, as well as Drake's loving behavior toward Shane. Such evidence is "powerful demonstrative evidence" of best interests, Shane argues, citing *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432 (*Aljamie D.*).

In *Aljamie D.*, a mother filed a section 388 petition seeking to modify the order placing her nine and 11-year-old daughters in long-term foster care. She alleged she fully complied with her case plan, visited the children consistently and the children wanted to return to her. The juvenile court denied her petition ex parte. (*Aljamie D.*, *supra*, 84 Cal.App.4th at p. 428.) During a contested section 366.26 hearing, the daughters testified they wanted to live with their mother. (*Aljamie D., supra,* at p. 430.) Nevertheless, the juvenile court ordered the daughters into legal guardianship with their maternal aunt and their mother appealed. (*Id.* at p. 431.)

The issue on appeal was whether the mother in *Aljamie D.* was entitled to an evidentiary hearing on her section 388 petition. The appellate court concluded that she was and reversed. (*Aljamie D.*, *supra*, 84 Cal.App.4th at pp. 432-434.) The court concluded that the mother's petition made a prima facie showing that the best interests of her daughters would potentially be advanced by her request for a change in the placement order. The court cited the fact that the girls repeatedly "made clear their first choice was to live with their mother." (*Id.* at p. 432.) The court clarified, "While a child's wishes are not determinative of her best interests, the child's testimony that she wants to live with her mother constitutes powerful demonstrative evidence that it would be in her best interest to allow her to do so." (*Ibid.*)

In our view, *Aljamie D.* is distinguishable procedurally and factually. First, the appellate court's treatment of the daughters' wishes was in the context of prima facie evidence to necessitate a hearing not a determination of best interest to support granting a section 388 petition. Indeed, the court stated the children's wishes were probative not

9

determinative. Further, unlike Drake, the daughters in *Aljamie D*. were older and more fully cognizant of their desires and they testified.

There is no doubt Drake remained bonded to Shane throughout these proceedings. However their bond did not mean Drake's best interest would be served by returning him to Shane when Shane did not take responsibility for his conduct and when Drake was doing well in his adoptive home.

We find no abuse of discretion in the juvenile court's evaluation of best interest and in its order denying Shane's section 388 petition. Because we affirm the juvenile court's order denying Shane's section 388 petition, we need not address his contention that the juvenile court could have continued reunification services beyond the statutory limitation.

## II. Failure to apply the beneficial relationship exception

Shane also contends the juvenile court erred by failing to apply the beneficial relationship exception to termination of his parental rights to Drake. He contends he maintained a parent/child relationship with Drake through visitation and that the juvenile court could infer from the strength of their bond that Drake would be harmed if their relationship was severed.

Once a dependency case reaches the permanency planning stage, the statutory presumption is that termination is in an adoptable child's best interests and, therefore, not detrimental. (§ 366.26, subd. (b); *In re Lorenzo C*. (1997) 54 Cal.App.4th 1330, 1343-1344 (*Lorenzo C*.).) It is the parent's burden to show that termination would be detrimental under one of the statutory exceptions. (*In re Zachary G*. (1999) 77 Cal.App.4th 799, 809.) The beneficial relationship exception in section 366.26, subdivision (c)(1)(B)(i), involves a two-part test; did the parent maintain regular visitation and contact with the child, and would the child benefit from continuing the relationship.

For the beneficial relationship exception to apply:

10

"[T]he parent-child relationship [must] promote the well-being of the child to such a degree that it outweighs the well-being the child would gain in a permanent home with new, adoptive parents. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ….) A juvenile court must therefore: 'balance … the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' (*Id.* at p. 575.)" (*Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1342.)

When a juvenile court rejects a detriment claim and terminates parental rights, the appellate issue is whether the juvenile court abused its discretion in so doing. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*).) The decision is not reviewed, as Shane argues, for substantial evidence that termination would be detrimental.

To conclude there was an abuse of discretion, the proof offered must be uncontradicted and unimpeached so that discretion could only be exercised in one way, compelling a finding in favor of the appellant as a matter of law. (*Roesch v. De Mota* (1944) 24 Cal.2d 563, 570-571; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) Based on our review of the record, we conclude the juvenile court properly exercised its discretion in rejecting Shane's argument.

There is no dispute Shane maintained regular contact with Drake and thus satisfied the first part of the two-part test. Shane failed to establish, however, the second part, that Drake would benefit from continuing his relationship with him. While Shane presented evidence Drake recognized him as his father and they had pleasant visits and loving contact, Shane did not establish he fulfilled a parental role. Nor did he establish it would be detrimental to Drake to sever their relationship.

Shane argues the parent/child bond he shared with Drake during the two years he parented him and Drake's positive reaction to him evidence the kind of relationship envisioned by the beneficial relationship exception. Shane likens himself to the father in

11

*In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), who "continued the significant parent-child relationship *despite* the lack of day-to-day contact" with Drake after he was removed from Shane's custody. (*Id*. at p. 299.) The *S.B*. court found the beneficial relationship exception applied and reversed the judgment terminating parental rights. (*Id.* at pp. 301, 303.)

*S.B*., however, is factually distinguishable. The father in that case fully complied with his case plan and demonstrated a "constant" devotion to his daughter. (*S.B.*, *supra*, 164 Cal.App.4th at p. 300.) His daughter loved her father, wanted their relationship to continue and derived benefit from their visits. (*Id*. at pp. 300-301.) In addition, an expert witness testified there was a potential for harm to the child if her relationship with her father was severed. (*Id*. at p. 296.)

In this case, Shane presented no such evidence. He received reunification services for an extended period of time, but did not comply. Further, he did not present any evidence that Drake would be harmed by severance of their relationship. At most, according to Windi, Drake would miss his father.

"The juvenile court may reject the parent's claim [termination of parental rights would be detrimental] simply by finding that the relationship maintained during visitation does not benefit the child significantly enough to outweigh the strong preference for adoption." (*Jasmine D*., *supra*, 78 Cal.App.4th at p. 1350.) The benefit of a stable, permanent adoptive home for Drake outweighed the benefit of a continued relationship with Shane, who despite his continued contact and visitation failed to overcome the problem leading to Drake's dependency on the juvenile court. We find no abuse of discretion.

## DISPOSITION

The orders denying the section 388 petition and terminating parental rights are affirmed.